STATE OF IOWA ex rel. E. A. Farnsworth, Mine Inspector, Appellant, v. JOHN PADAVICH et al., Appellees.

No. 43899.

JUNE 15, 1937.

992

John H. Mitchell, Attorney General, LeRoy A. Rader, Spec. Asst. Attorney General, and Hugh G. Guernsey, County Attorney, for appellant.

F. L. Simmons, for appellees.

SAGER, J.—Before proceeding to a decision of what we regard as the principal question involved, we dispose of certain claims made by the appellees, which we deem it unnecessary now to consider. We refer especially to the claim made by appellees that certain sections of the "mining code" are unconstitutional. We need not pass on this question now.

Appellees also allege a defect of parties, but in the view we take of this case this needs no attention.

It appears from the record that John Padavich and his four sons operated a coal mine owned by a codefendant, using in their work a machine powered by a kerosene engine. There were, at the time these proceedings were started, no persons employed in the mine other than the owners; and, if the provisions of the mining code were designed, as they seem to be, for the protection of employees, there was no occasion for making any order to protect the health of the owners. Whether the state has the power to enact laws to prevent the owners of property using it under conditions which, according to the theories of the inspector in this case, might amount to suicide, we do not stop now to inquire. There is no difference of opinion between the parties hereto on the question whether the statute was primarily designed to protect miners rather than operators; and there is, we think, no room for such difference because, more than forty times the statutes use in this connection the word "employee" or its equivalent.

While we feel that the trial court reached the correct conclusion in denying the injunction asked for, we prefer to affirm its decision on broader grounds than those upon which the court rested its decree.

The court seems to place its decision almost, if not entirely, on the principle announced in the case of Goodlove v. Logan, 217 Iowa 98, 251 N. W. 39, and similar cases which deny the right of the legislature to delegate its power to make laws. This quotation from the trial court's opinion will give an idea of its views:

"By reason of the citations and conclusions as herein set forth this Court is of the opinion that the state mine inspector had no right to enact rules which are legislative in nature and which constitute more than the administration of authority granted said inspectors by the legislature."

Without passing now upon the question whether the trial court took the correct view of the regulations sought to be imposed by the inspector, we hold that that officer exceeded the authority vested in him by the statutes.

Farnsworth, the inspector whose actions are in question herein, was appointed to his present position on July 1, 1935, and on the 25th day of September, 1935, made the order here challenged; and which appellees claim would have the effect of preventing any mining operations on the property owned by them. The record as presented by the appellant itself seems to be a full answer to and denial of the assumption of the authority claimed by this inspector. For instance, he was asked the question:

"Now, I suppose you have made an inspection of that mine, or probably more than one, since you have been mine inspector? A. No, sir, I have not been into the interior of the mine."

This, too, appears in the inspector's testimony:

"I have been out to the mine twice, and on both occasions Mr. Padavich (one of the appellees) asked me if I wanted to go into the mine, and I said 'no.' "

Following this statement the court took a hand, as follows:

"Let me ask some questions. I don't want to direct this examination, but I am asked to perform—to issue, rather, a mandatory injunction here of severe nature.

"Q. You have never been in the mine? A. No. It isn't necessary.

"Q. And all that you know is what you have been told?
A. No, no, it is not.

"Q. Well, then I misunderstood your testimony. A. No. The question wasn't asked, and I only answered what was asked.

"Q. Well, then, I will ask you, what do you know about the operation of this engine down there then? A. If it please the Court, it isn't necessary to go into the mine to know that they have a mining machine there."

The trial court, after receiving what seems to have been an unsatisfactory answer, said:

"I am trying to get the facts. The responsibility is mine in making any orders here, and I want to have it based on something that is substantial."

Thereupon the court received this further answer:

"I have not been down there because, Your Honor, I came—I was appointed and came down here on the 1st day of July; I was an absolute stranger in Centerville, I was an absolute stranger to the District, as to the location of the mines. I endeavored to get around to as many mines as I could, to correct what I thought were the worst faults."

John Padavich, one of the appellees, testified:

"My sons and I operate a coal mine west of Centerville, the one about which Mr. Farnsworth has been testifying. We use one combustion engine with the coal oil, kerosene for fuel.

"Q. Did Mr. Holland, the former mine inspector, give you instructions to take that machine out of the mine? A. He just told me to bring it (the engine) out to let them fellows see it—not them fellows, but the other fellows, see, and I said all right, but I did not bring it out because the boys told me he was going too far, * * *."

Who these "fellows" may have been is not clear from the record, but there is the suggestion in the record that it had reference to persons interested in a miners' union.

That there was possibly behind the activities of this inspector the interest of a miners' union is hinted by the court in this passage with the witness:

"The Court: The thing I am interested in is whether or

not it is a violation of the law. Now is it being advocated or fostered by the miners' union? A. Absolutely not. I am independent of everybody.

"The Court: That is, your attitude should be the same attitude as my attitude should be? A. My attitude is just similar to yours. I am working for the State of Iowa. I am working for the general health of the miner. I take nothing—I have in mind I am making a broad statement, but I wish it to be broad, and that is, when there is a question, any hint of a question, between an operator and the employed man, or the question will have passed on to the operator, the miner will get the best of it, I am here to see that the miner has as near a healthy, safe condition to work in as regards to the mining law under which we proceed."

That the inspector himself did not overlook the thought of union interest appears from a statement made by him to the court:

"I don't know that Mr. Padavich was told by the union officials that if he didn't join the union they were going to go after him."

And then further to the court:

"I believe I informed you that I was working for the people, that the mine inspectors had no superior officers, we were working for the good of the men in general of the State of Iowa."

Padavich said that he and his sons owned and worked the mine, and that all were grown up and had an interest in it.

It is claimed he told the inspector to get off the place, but he testified:

"I am glad to see him come and show me if there is anything to show. I asked him twice to go and help me and show me if there was anything wrong."

On being recalled for further redirect examination the inspector gave something of a hint of his attitude in this way. He was asked the question:

"I would like for you to tell the Court about the facilities of the Padavich mine, as to the air in the mine."

The witness answered:

"May I talk to you, Judge? That is, I mean talk directly to you from the witness stand, so that everybody else would hear it. The Court: Well, I have got to decide this, so go ahead."

Then followed a general discussion by the witness as to ventilation of mines generally, and a recitation of the qualifications and experience claimed by him as a mining expert.

"The Padavich mine, so far as the ventilation is concerned, does not differ from any other mine; * * *."

Continuing, the inspector gave the court his theories as to what happens to the miner from carbon monoxide, in this language:

"They can work in it continuously with a small amount of it, for years, but eventually—I could state to the Court names of various men that this very same thing has literally made them a walking corpse for the last two or three years of their life."

Following further discussion as to air shafts apparently shown in the map of the Padavich mine, which map he seems not to have examined with any care, he said:

"I didn't put a tape on to measure them exactly."

He then went on:

"The way that Mr. Padavich has informed me that he operates his engine, there may not be any possibility of his being in any great danger."

Proceeding, he went into a more or less illuminating illustration, the directness of which seemed somewhat doubtful even to himself, because he addressed this inquiry to the court:

"Does the Judge grasp what I mean?"

Whether the "Judge" did or did not "grasp" what the witness meant is a subject for curious speculation in which we have no inclination to indulge.

The witness admitted that he had never taken measurements of the air course in the mine.

"* * * we can't tell on a certain day, but as I have already told the Court, the temperature is controlling—controls the

amount of ventilation. It may be a whole lot one day and very little the next.''

With the light which the foregoing casts upon the estimate which this inspector made of his authority, we proceed to examine his activities which are the occasion of this lawsuit.

Without having been in the mine, without a test of air conditions, with no knowledge whatever as to whether anybody's health was in danger, and without informing himself or having any knowledge about it from any inquiry whatever, so far as the record shows, the state filed its petition in equity in this cause to enjoin the operation of this mine. This request is based on allegations that appellees are using, not a gasoline engine as mentioned in Code section 1308, but an ''internal combustion engine''; and on the theory that a ''gasoline'' and an internal combustion engine were the same thing, this inspector gave appellees ''a written notice to remove all mining machines operated with or by gasoline or any other fuel oil whatsoever.'' The notice attached as Exhibit A to the state's petition, purporting to be a copy of that sent by the inspector, said:

''* * * I am hereby ordering you to remove all mining machines that may be in your mine that are operated with or by gasoline *or any other fuel oil whatsoever.*'' (Italics ours.)

With the petition likewise appears as Exhibit B: ''State of Iowa by Mine Inspector vs. Padavich Coal Co.'' The purpose of this document is not very clear, but it alleges that the defendants are operating a mining machine impelled by gasoline ''*or other fuel oils.*'' (Italics ours.) Exhibit B further states, referring to claims made in the petition, that such petition asks that the defendants be enjoined from ''interfering with mine inspector in the discharge of his duties at their mine,'' and, construing the petition further, says that it asks that the defendants be compelled'' to obey the orders of the mine inspector or to be cited to this court for a hearing for contempt of court, unless said defendants elect to close the mine''; and still further, that the defendants be required to remove and keep from the mine the above-mentioned mining machine, and that ''the hoisting engine be moved back from the shaft of the mine to a distance of fifty (50) feet, said engine as now located constituting a fire hazard and therefore dangerous to human life; especially to those who

are employed in the mine." This last statement is made in the face of the fact that the inspector did not know where the hoisting engine was located.

Turning now to the statutes which we regard applicable to the question before us, it seems clear that this inspector exceeded the authority vested in him and he apparently assumed that his *ipse dixit* would be a sufficient substitute for the inspections required or implied by the statute. Reference has been made in the record, and in the decision of the trial court, to Code section 1276. This has to do with unhealthful conditions in mines generally. It provides:

"When the mine inspector finds the air insufficient or the employees working under unsafe or improper health conditions, he shall at once give notice to the mine operator, * * *."

If it be claimed by the state that it was entitled to an injunction under this section, two answers occur: first, the inspector had never been in the mine and knew nothing about the air conditions; second, there were no "employees" in the mine. If it be thought that section 1308 was a sufficient warrant for the proceedings attempted herein, an examination of it will show that it is not. This provides:

"No gasoline engine, * * * shall be located in or near the air current which supplies the employees of any mine with air, but in all cases shall be placed upon the return of the air and located at least twenty feet from any and all traveling ways."

As a basis for his orders the mine inspector uses the words "gasoline engine" as being equivalent to and synonymous with "internal combustion engine". With the scientific aspects of this we have no desire to deal. It is sufficient to say that the legislature said "gasoline" and nothing about petroleum products or "any other fuel oil whatsoever." (Appellant's Exhibit A.) That the legislature does not regard "gasoline" as being kerosene and other petroleum products is evidenced by section 3192 of the Code, which makes special regulations with reference to gasoline, benzine, or naphtha; and by section 3194, which requires containers in which gasoline is delivered to be painted "bright red and plainly marked 'gasoline'."

Turning to the record and applying it to section 1308, we again call attention to the fact that there were no employees in

the mine; and, that the inspector never having been in it, he had no way of knowing where the engine was located with reference to the return of air or traveling ways. The inspector's claim that because the internal combustion engine used by the appellees in their mine was started by the use of a blow torch burning gasoline the engine itself was a gasoline engine, is too tenuous to warrant more than a passing notice.

Other sections of the Code bearing on the matter before us might be quoted and examined, but we conclude with a reference to section 1332 of the Code. This provides, among other things:

"The burden of proof shall rest upon the plaintiff to show that the proposed change, improvement, or device is reasonably required for the safety or health of the employees."

The record as we read it, and as it is presented by appellant, wholly fails to meet this burden unless the assumption of authority on the part of this inspector be held sufficient to that end. We decline so to hold. As has already been pointed out, this mine was being worked by its owners without the help of employees. The inspector had never been in it, knew nothing of its air conditions, location of machinery, or anything of the conditions in it. He acted, we hold, arbitrarily and with a mistaken notion of his powers under the law. At any rate, until the legislature compels, we are not disposed to sustain the authority claimed by the state under the circumstances disclosed by this record.

Whether the trial court was right in the basis upon which it placed its decision need not be examined. It is sufficient that its conclusion was right, and its decree is, therefore, affirmed.— Affirmed.

RICHARDS, C. J., and ANDERSON, DONEGAN, KINTZINGER, PARSONS, STIGER, and HAMILTON, JJ., concur.